**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | |
|---|---|
| NETWORK-1 TECHNOLOGIES, INC.<br><br>*Plaintiff*,<br><br>vs.<br><br>ALCATEL-LUCENT USA INC., ET AL.,<br><br>*Defendants*. | CASE NO. 6:11-cv-492-RWS-KNM<br><br>JURY TRIAL DEMANDED |

**Network-1 Technologies, Inc.'s**

**Reply Claim Construction Brief (P.R. 4-5(c))**

**Table of Contents**

1.      "data node"..................................................................................................... 1
3.      "main power source"...................................................................................... 1
4.      "secondary power source" ............................................................................. 4
5.      "low level current"......................................................................................... 7
6.      "preselected condition".................................................................................. 10
7.      "from … to".................................................................................................... 12

## Table of Authorities

**Cases**

*Abbott Labs. v. Sandoz, Inc.*,
   566 F.3d 1282 (Fed. Cir. 2009) .................................................................................................. 11

*Aventis Pharm. Inc. v. Amino Chemicals Ltd.*,
   715 F.3d 1363 (Fed. Cir. 2013) .................................................................................................... 1

*Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*,
   359 F.3d 1367 (Fed. Cir. 2004) .................................................................................................. 12

*Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.*,
   796 F.2d 443 (Fed. Cir. 1986) ...................................................................................................... 8

*Charles E. Hill & Associates, Inc. v. Abt. Elecs., Inc.*,
   No. 2:09-CV-313-JRG, 2012 WL 72714 (E.D. Tex. Jan. 10, 2012) ........................................... 1

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.*,
   438 F.3d 1374 (Fed. Cir. 2006) .................................................................................................... 9

*Genentech, Inc. v. Chiron*,
   112 F.3d 495 (Fed. Cir. 1997) ...................................................................................................... 3

*Hill–Rom Servs., Inc. v. Stryker Corp.*,
   755 F.3d 1367 (Fed. Cir. 2014) .............................................................................................. 1, 10

*Kinetic Concepts, Inc. v. Blue Sky Med. Grp., Inc.*,
   554 F.3d 1010 (Fed. Cir. 2009) .................................................................................................. 11

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
   358 F.3d 898 (Fed. Cir. 2004) .................................................................................................... 11

*Nystrom v. TREX Co.*,
   424 F.3d 1136 (Fed. Cir. 2005) .................................................................................................. 11

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ..................................................................................... 2, 6, 9, 11

*Trivascular, Inc. v. Samuels*,
   812 F.3d 1056 (Fed. Cir. 2016) .................................................................................................... 1

*Williamson v. Citrix Online*, LLC,
   792 F.3d 1339 (Fed. Cir. 2015) .................................................................................................. 12

**1. "data node"**

Defendants fail to concede that an "Ethernet switch" is an example of a "data node," (Resp. 20-22), which gives rise to this dispute. Network-1 should prevail because Defendants offer no rebuttal to our showing that "data node" encompasses an "Ethernet switch." [1]

**3. "main power source"**

"There is a heavy presumption that claim terms are to be given their ordinary and customary meaning." *Aventis Pharm. Inc. v. Amino Chemicals Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013). "We depart from the plain and ordinary meaning of claim terms based on the specification in only two instances: lexicography and disavowal." *Hill–Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014).

Defendants ignore the ordinary meaning—that a "power source" can be AC or DC and that "main" does not connote DC but instead refers to the claimed main functions: supply power to the data node and deliver a low level current. Knox ¶¶33-47. Defendants' declarant never declares that the ordinary meaning of "main power source" requires DC. Neikirk ¶¶33-52. And Dr. Zimmerman, the testifying expert of four Defendants, admitted that the "ordinary meaning" of "main power source" in the context of the '930 patent is not limited to DC. Ex. 12, 114:2-8. [2]

---

[1] Contrary to Defendants' assertion (Resp. 21), "<u>such as</u> an Ethernet switch" does not limit a data node to an Ethernet switch, import an "Ethernet" limitation, or preclude non-Ethernet data nodes. Moreover, because each accused "data node" presented to the jury will be an Ethernet switch, the example will remove (not introduce) jury confusion. *Charles E. Hill & Associates, Inc. v. Abt. Elecs., Inc.*, No. 2:09-CV-313-JRG, 2012 WL 72714, at *7 (E.D. Tex. Jan. 10, 2012) (example supported by the specification will "assist the jury").

[2] Defendants attempt to back away from Dr. Zimmerman's admission suggesting that it applied a different claim construction standard and "does not address" the AC/DC issue. Resp. 13. Defendants are wrong. He was not asked about the "broadest reasonable interpretation" but instead "[w]hat would one of ordinary skill in the art understand is the ordinary meaning of 'main power source.'" Ex. 12, 114:2-8. And the reason why Dr. Zimmerman's response did not mention the AC/DC issue is because when applying the "ordinary meaning of 'main power source," AC/DC is not an issue—the phrase includes both. Moreover, if this construction were the "broadest reasonable construction," it would necessarily be "reasonable… in light of the specification." *Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1061 (Fed. Cir. 2016). If a "main power source" encompassing AC and DC is a reasonable construction in light of the

Moreover, Defendants do not assert that lexicography or disavowal apply because nothing in the specification or prosecution history defines "main power source" as DC or disavows the full scope of the phrase—the specification never even mentions a DC power source.

Rather than addressing the ordinary meaning, Defendants rely on the district court's prior construction which was premised on the assumption that "Figure 3 … shows that the main power source is a source of DC power." *Cisco*, at 8. There are two problems here. *First*, the Federal Circuit has "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005). Accordingly, had Figure 3 disclosed a DC main power source, it would be improper to limit "main power source" to DC. *Second*, Figure 3 does not depict (expressly or inherently) a DC power source—"the main power supply 70 of Figure 3 can be either an AC or DC source of power." Knox ¶49; Knox ¶¶128-137.

Defendants also assert that "main power source" should be limited to DC because an AC power source "would not work" in the context of the claims—*i.e.*, it could not (1) power the data node, or (2) deliver a low level current to an access device. Resp. 11. Defendants are wrong.[3]

(1) *"main power source connected to supply power to the data node."* Defendants assert that "virtually all" data nodes "are designed to operate at a particular DC voltage level" and it would be "unusual" for a data node to operate on AC power. Resp. at 12. *First*, there is no claim construction principle that carves out exceptions to the ordinary meaning if it is "unusual" for the claimed system to operate based on a particular embodiment. *Second*, Defendants are

---

'930 specification, how can a DC limitation be required in the construction, particularly when the specification does not mention a DC power source, much less limit the invention to one?

[3]     If it were true that an AC main power source would be inoperable, then Defendants' systems (which most certainly are operable) could not face any risk of infringement from including AC within the scope of "main power source," and Defendants would not bother to argue it. That Defendants devote their entire argument to excluding AC is strong circumstantial evidence that AC does in fact work in the context of the claims.

2

wrong. It is quite common for data nodes that operate on DC voltage to receive power from an AC source, which is what Figure 3 depicts, *Knox* ¶¶131-135. And nothing in the claims or specification precludes an AC main power source "connected to supply power to the data node" where the data node includes an AC/DC converter to convert the received AC to DC to operate the data node circuitry. The claim language "'[c]omprising' … means … other elements may be added." *Genentech, Inc. v. Chiron*, 112 F.3d 495, 501 (Fed. Cir. 1997). Defendants' argument impermissibly precludes other elements, such as a converter, which as Defendants' expert recognized is actually reflected in Figure 3. Neikirk ¶35 ("a device that converts AC power … into DC power needed to operate the data node … is what is illustrated in Figure 3").

(2) *"delivering a low level current from said main power source."* Defendants assert that if an AC source delivered the low level current, "it would always detect a 'varying' level voltage," which "would produce false-positive detection results" and "signal distortion." Resp. 12. *First*, Defendants' argument is improperly based on the response to the switching supply in the access device 10 of the preferred embodiment. While access device 10 of the preferred embodiment includes a "dc-dc switching supply" ('930, 2:41), as the *D-Link* court recognized, "the dc-dc switching supply [is an] attempt[] to adopt the preferred embodiment's limitations into the claim construction." *D-Link*, at 9-10. The invention can use a voltage condition other than varying voltage to signal positive detection, and the access device can contain a non-switching power supply or a different termination that produces a different voltage condition. *Second*, nothing in the claim language—"comprising … delivering a low level current from said main power source"—or specification precludes either (a) including an AC/DC converter in (or in parallel with) the data node to convert the current to DC before delivering the low level current to the access device, or (b) including an AC/DC converter in the access device itself to convert an AC low level current delivered from the "main power source." Knox Decl. ¶137.

3

**4.     "secondary power source"**

Defendants do not contest the *Cisco* ruling that the construction of "secondary power source" "does not impose a requirement of 'entirely separate and distinct'" power sources, and "does not require 'separate identifiable physical elements' for each of the power sources." *Cisco*, at 11. It is undisputed, therefore, that the hallmark of "physical separation"—distinctly separate physical elements—is <u>not</u> required. Why then tell a lay jury that the main and secondary power sources must be "physically separate"? Only to mislead jurors into thinking that main and secondary power sources must be distinctly separate physically elements, which both sides agree is wrong.

Moreover, the *Cisco* court further ruled, and Defendants concede (Resp. 14), that the only aspect of separateness required is separate driving points in the circuits that connect the power sources to the loads. *Cisco,* at 12 (the construction "requires only that there be physically separate 'driving points' because each power source 'drives' a separate load"). Separate driving points do not imply anything about the physical construction of the power sources, because the driving points are typically located on the circuit apart from the physical components that supply power. Knox ¶¶148-149. As a result, the attribute of separate driving points is certainly not conveyed to a lay jury by "the secondary power source is physically separate from the main power source." Instead, if that point is to be conveyed, it should be stated directly by instructing: "the secondary power source can be the same source of power as the main power source, and they require only separate driving points for each load driven."

Moreover, Defendants' construction is not correct. [4]

---

[4]     Defendants assert that Network-1's analysis is "primarily based on extrinsic evidence, despite the clear weight of the intrinsic evidence." Resp. 16. Defendants are wrong. Network-1 properly starts with "[t]he ordinary meaning of 'secondary power source'" (Opening Brief 12), then addresses the contextual claim language (*id*. 13), the specification (*id*. 14), and finally observes that that the prosecution history does not disclaim (but rather supports) Network-1's construction. *Id*. 15-16. Defendants do not address

4

(1) Defendants attempt to minimize the admission of Dr. Zimmerman, the expert of four Defendants, stating that it "was offered under [a] broader claim construction standard." Resp. 18. Dr. Zimmerman, however, was not asked about the "broadest reasonable interpretation" but instead, "[w]hat would one of ordinary skill in the art understand the phrase 'secondary power source' to mean, as it's used in the claims of the '930 patent." His answer was unambiguous: it "may be derived from or the same as the main power source." Ex. 12, 114:11-20.

(2) Defendants assert that because the "main power source" supplies power "to the data node" while the "secondary power source" supplies power "from the data node," they must be physically distinct. Resp. 15. Defendants are wrong. The single Power Source 16 depicted in Figure 1 is both "connected to supply power to the data node" (through line 18) and is also "arranged to supply power from the data node via the data signaling pair to the access device" (through line 18 and cable 12). '930, 2:52-57 ("power source 16 … is connected to cable 12 via lines 18 to supply a power level sensing potential to the remote access equipment 10 over one of the cable conductors"). Similarly, contrary to Defendants' suggestions (Resp. 15), the single Power Source 16 depicted in Figure 1 is both a source of the "low level current" and the "control[ed] power" to the access device, again via lines 18 and cable 12. Knox. ¶¶142-144.

(3) Defendants assert the "main" and "secondary" power sources must be physically separate because they "drive separate loads." Resp. 15. This is wrong (Knox ¶¶148-151), as the *Cisco* court found. *Cisco*, at 12 ("the electrical energy applied to the access device via the data node [i.e. secondary power] originates from the main power source"); Knox Decl. ¶63.

(4) Defendants assert that it would be "nonsensical" for the claims to separately define the functions of a "main" and "secondary" power source if they were not physically separate.

---

the meaning of the claim language itself and do not dispute that its ordinary meaning compels Network-1's construction.

Resp. 16. Defendants are wrong. It was sensible to recite "main" and "secondary" power sources to convey the relationship between the two categories of power functions: "main" functions that always occur first (supplying power to the data node and delivering the level current); and a "secondary" function that may not occur and, if it does, occurs second (supplying power to the access device). Moreover, it would be nonsensical to use "main" and "secondary" to convey physical separation, when those terms have no such connotation.

(5) Defendants assert the "specification… confirms the concept of physical separateness." Resp. 16. Defendants are wrong.

*First*, had the '930 specification disclosed a single embodiment in which the secondary power source was physically separate from the main power source, it would be improper to limit the claims to that embodiment. The Federal Circuit "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." *Phillips*, 415 F.3d at 1323.

*Second*, the specification does exactly the opposite—it discloses a preferred embodiment with a single power source 16 that performs all functions of the "main" and "secondary" power source. Knox Decl. ¶¶65-66; 139-144. Defendants completely ignore that a three-judge panel of subject matter experts from the Patent Trial and Appeal Board found that "Figure 1 of the Specification also depicts a single 'power source 16,'" and therefore the "main" and "secondary" power source need not be physically separate. Ex. 8 at 13 (*citing* '930, 2:52-57). Moreover, Defendants' expert does not dispute the showing by Network-1's expert, Dr. Knox, that Figure 1 depicts a circuit with a single power source that provides all main and secondary functions. Notably, Defendants' expert never asserts that Figure 1 depicts two physically separate power sources or that the circuit in Figure 1 could function only if an additional physically separate power source were inserted. He says only that closing switch 28 in Figure 1 starts the flow of

6

secondary power (operating power to an access device) and "switch 28, is clearly physically separate from the power source 16." A physically separate switch is a separate driving point, not a physically separate power source. Knox ¶¶148-151.

Moreover, it is undisputed that closing switch 28 commences secondary power by increasing current flow from Power Source 16—i.e., *Power Source 16 is the secondary power source*. Closing switch 28 allows the current to bypass resistor 26, thereby increasing current flow between power source 16 and ground (depicted at bottom of Figure 1) on the path from line 18 over the data signaling pair 12 to the access device 10, back over the data signaling pair, to line 20, through switch 28, and to ground. Knox ¶¶143-144. Defendants' expert also points to Figure 2, but does not dispute Dr. Knox's analysis that it depicts a single power source (connected via line 39) for both the low level current (main function) and operating power (secondary function). Knox ¶67. Nor does he dispute Dr. Knox's showing that the power source for Figure 2 could be the single Power Source 16 from Figure 1. *Id*. And power source 70 in Figure 3 supplies power for both the main and secondary functions. Knox Decl. ¶145, n13. That a component inside the 8-Port Ethernet switches might convert the power from AC to DC or modify the voltage does not change the fact that power comes from power source 70. *Id*.

Finally, if the Court were to require "physically separate" power sources, the Court should, consistent with *D-Link*, *Cisco*, and the Defendants' representations, expressly clarify that the construction "does not impose a requirement of entirely separate and distinct," "does not require separate identifiable physical elements for each of the power sources," and "requires only that there be physically separate 'driving points' because each power source 'drives' a separate load." *Cisco*, at 11-12 (internal quotes and emphasis omitted).

5.  **"low level current"**

    (1) Defendants attempt to justify importing the illustrative response to a "low level

7

current" on the exemplary dc-dc switching supply in the access device of the preferred embodiment because it is the "only objective standard provided in the specification." Resp. 3. Defendants are wrong.

*First*, the specification is examined to identify a standard for the invention as a whole, not a standard for a particular embodiment of the invention—a standard to "to serve the inventor's purposes," not to serve the particular purpose of a preferred embodiment. *Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.*, 796 F.2d 443, 450 (Fed. Cir. 1986). Defendants ignore the specification's express statements in the Summary of the Invention about why the current of the invention should be kept at a "low" level. It was not "to cause the access device to start up" as Defendants propose. Instead, the specification expressly states that the purpose of having the current at a "low level" is for "automatically determining if remote equipment is capable of remote power feed and if it is determined that the remote equipment is able to accept power remotely then to provide power." '930, 1:14-19; 1:41-44; 1:5-56; *see* Ex. 7 at 5-6; Ex. 19 at 5. Accordingly, only a current that is sufficiently low that it will not power the access device would satisfy this purpose. Defendants do not dispute whether a current level is sufficient to operate an access device is an objective test. *See* Knox Decl. ¶¶152-155. Moreover, when interpreting a term of degree, the Patent Trial and Appeal Board applies the identical legal standard applicable in district court. Ex. 8 at 8. A three-judge panel of subject matter experts examined the '930 specification and identified as the objective benchmark for the low level current: "sufficiently low that, by itself, it will not operate the access device." Ex. 8 at 9-10.

*Second*, Defendants' construction is not based on the purpose served by the low level current for the invention, but instead on the effect on the dc-dc switching supply of the preferred embodiment. Defendants assert: "there are no other embodiments disclosed in the specification … As a result, Defendants' proposed construction does not import a limitation from the

8

preferred embodiment." Resp. 5-6. This is contrary to controlling Federal Circuit law which "rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." *Phillips*, 415 F.3d at 1323.

(2) Defendants assert Network-1's construction "conflicts with the teachings of the specification" because it "encompasses … even a current that produces a 'fixed' voltage drop." Resp. 4. Defendants are wrong. This argument rests on the false premise that the invention is limited to the exact details of the preferred embodiment, in which the voltage signature that would identify an access device capable of accepting remote power was the particular sawtooth voltage pattern produced by a "dc-dc switching supply … beginning to start up." '930, 3:12-17. But the invention is not limited to that embodiment. Both claim 6 and the Summary of the Invention allow for any "preselected condition of the voltage" (*e.g.*, a voltage drop or increase) to be designated as the detection signature. '930, 2:1-14. Neither claim 6 nor the specification are limited to the particular voltage associated with "a dc-dc switching supply … beginning to start up," '930, 3:12-17. [5] Accordingly, Network-1's construction (which may be a current that produces a voltage drop) is perfectly consistent with the claim language and the specification.

(3) Defendants assert that "Network-1's argument that Defendants' construction reads out 'beginning' ignores Defendants' full construction, which includes 'not sufficient to sustain the start up'—i.e., the access device does not actually operate." Resp. at 6. But if "not actually operate" is what Defendants intend their upper boundary to convey, then Network-1's upper boundary—"not operate the access device"—is correct.

(4) Defendants assert that the requirement that a "data signal is not a low level current"

---

[5] Notably, dependent claim 7 adds the limitation that the condition for increasing power is "a 'sawtooth' voltage level sensed on the data signaling pair." This confirms that independent claim 6 is not limited to the preferred embodiment. *Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380 (Fed. Cir. 2006) ("limitations stated in dependent claims are not to be read into the indepedent claim from which they depend") (internal quotations omitted).

"is not supported by any evidence." Resp. 6. That is false. Network-1 presented (1) the claim language itself, *i.e.*, the difference in ordinary meaning between a "current" and a "data signal" (*see* Knox Decl. ¶¶88-91); and (2) the prosecution history, in which Network-1 unambiguously disavowed using a "data signal" for detection as being "in stark contrast" to and "very different" from a "low level current." *See* Ex. 7 at 9-10; *id*. at 10 (the "data signal… in the prior art taught sharply away from" the low level current).

**6.    "preselected condition"**

Under controlling federal circuit law, "We depart from the plain and ordinary meaning of claim terms based on the specification in only two instances: lexicography and disavowal." *Hill–Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014). Defendants do not assert, much less establish, either lexicography or disavowal. Instead, Defendants point to the specifics of a preferred embodiment and assert that the claim must be limited to that embodiment, because that is the only embodiment disclosed. [6] Defendants are again wrong.

In none of the cases cited by Defendants (Resp. 9-10) did the court hold that the claim was limited to a disclosed embodiment. Instead, in each case the court found an *unambiguous disavowal* of claim scope in the specification or prosecution history. [7] No such disavowal is

---

[6]    Defendants admit that "under the plain language of the claim, the 'preselected condition' is a condition of the voltage level produced by the low level current." Resp. 7.

[7]    In *Gen. Am. Trans. Corp. v. Cryo-Trans, Inc.*, 93 F.3d 766 (Fed. Cir. 1996), "this court interpreted the pertinent claim language narrowly, not merely because the specification did not describe a broader embodiment, but because the specification, claim, or prosecution history made clear that the invention was limited to a particular structure." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 907-08 (Fed. Cir. 2004) (*citing Gen Am*, 93 F.3d at 770). In *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282 (Fed. Cir. 2009), the Federal Circuit confirmed that "this court has expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment" and held that the prosecution history "evince[s] … a clear intention to limit" the claim scope. *Abbott*, 566 F.3d 1290 (internal quotations omitted). *Nystrom v. TREX Co.*, 424 F.3d 1136, 1145 (Fed. Cir. 2005) and *Kinetic Concepts, Inc. v. Blue Sky Med. Grp., Inc.*, 554 F.3d 1010, 1019 (Fed. Cir. 2009) simply confirm that a claim cannot be construed "to cover more than the ordinary and customary meaning" that is appropriate in the context of the patent based on a "broader definition" that can be found in an extrinsic source. *Nystrom*, 424 F.3d. 1145; *Kinetic*, 554 F.3d 1019.

found in the '930 patent. Instead, the "Summary of the Invention" calls for "controlling power supplied by the secondary power source to the access device in response to a preselected condition of the voltage level," *with no further limitation* on the preselected condition. '930, 2:12-15. Defendants do not point to a disavowal of claim scope for "preselected condition." Resp. 7-8. Instead, Defendants merely point to the "Description of the Preferred Embodiment" ('930, 2:33-35), and assert that the particular preselected conditions used in that embodiment were a "varying level voltage drop … as an indication that an access device may be capable of being remotely powered," and "a fixed voltage drop and no voltage drop indicates that an access device 'is unable to support remote power feed.'" Resp. 8, 10 (*citing* '930, 3:4-11). [8] But the appearance of a particular method in a preferred embodiment is never sufficient to limit claim scope. *Phillips*, 415 F.3d at 1323.

The specification does not imply, much less unambiguously state, that a necessary feature of the invention is that a varying voltage level must always indicate "yes" for remote power, and a fixed or no voltage drop must always indicate "no" for remote power. The specification states only that in the "Preferred Embodiment,"—*i.e.*, in this particular illustrative example—that is how it was done. [9] This case is just like *Williamson v. Citrix Online*, LLC, 792 F.3d 1339, 1346-1347 (Fed. Cir. 2015), where the defendant asserted that its construction "does not import a limitation from the preferred embodiment, but simply … is consistent with what the patentee invented and disclosed…and is consistent with the only depiction," the identical argument

---

[8] This results from the effect on a particular dc-dc switching supply which the *D-Link* court previously held was merely "illustrative," i.e. an example, not a required component of the invention. *D-Link*, 9-10, 13 ("the dc-dc switching supply [is an] attempt[] to adopt the preferred embodiment's limitations into the claim construction. … [T]he dc-dc switching supply is also illustrative… The claim language itself does not recite an access device power supply.")

[9] For example, assume a patent claimed a "traffic control system that allows cars to proceed based on a preselected color of the light." Assume, in a preferred embodiment, a yellow light signals cars to proceed, and a green light signals them to stop. Under Defendants' flawed approach, "preselected light color" cannot have its ordinary meaning ("a light color selected in advance") and cannot encompass a green light because the claim must be limited to its preferred embodiment, where green signals stop.

11

Defendants make here. The Federal Circuit rejected the argument, holding that the "district court erred in its construction … by improperly importing an extraneous 'pictorial map' limitation in the claim," and again cautioned against limiting constructions "to the preferred embodiments or specific examples in the specification." *Id*. (internal quotations omitted). [10]

### 7. "from … to"

Defendants assert "the '930 patent makes clear that '<u>from</u> said main power source' means '<u>supplied</u> by the main power source.'" Resp. 20. Defendants are wrong. As Defendants observed, other claim elements use the term "supply." Claim 6; Resp. 19. That "from said main power source" uses "from" rather than "supply" does not demonstrate that "from" should be replaced with "supplied"—it demonstrates the exact opposite; it "gives rise to an inference that a different meaning should be assigned to each." *Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1373 (Fed. Cir. 2004). [11]

Dated: May 27, 2016

Respectfully submitted,

/s/ Sean A. Luner by permission Andrea L. Fair

Sean A. Luner
State Bar No. 165443
Gregory S. Dovel
State Bar No. 135387
DOVEL & LUNER, LLP
201 Santa Monica Blvd., Suite 600
Santa Monica, CA 90401
Telephone: 310-656-7066
Email: sean@dovel.com
Email: greg@dovel.com

---

[10] Defendants include a section entitled "Defendant's Construction Is Consistent with the Prior Construction." Resp. 8-9. But in this section, Defendants argue that the district court's prior construction—which is word-for-word identical to Network-1's third proposed construction (*see* Opening Brief at 24, n. 11) and expressly does *not* import the illustrative example from the preferred embodiment (*see D-Link*, at 13)—should be rejected in favor of Defendants' construction which does.

[11] Rejecting Defendants' construction and adopting "no construction necessary" would resolve the dispute of whether "from" is limited to "supplied by."

T. John Ward, Jr.
State Bar No. 00794818
Claire Henry
State Bar No. 24053063
Andrea Fair
State Bar No. 24078488
WARD, SMITH & HILL, PLLC
1127 Judson Road, Suite 220
Longview, Texas 75601
Telephone: (903) 757-6400
Facsimile: (903) 757-2323
Email: jw@wsfirm.com
Email: claire@wsfirm.com
Email: andrea@wsfirm.com

ATTORNEYS FOR PLAINTIFF,
NETWORK-1 TECHNOLOGIES, INC.

### Certificate of Service

I certify that this document is being filed electronically and, as a result, is being served on counsel of record through the Electronic Filing System on the filing date listed above.

/s/ Andrea L. Fair