IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| NETWORK-1 TECHNOLOGIES, INC. | § | |
| | § | |
| | § | CIVIL ACTION NO. 6:11-cv-492- |
| v. | § | RWS-KNM |
| | § | |
| | § | |
| ALCATEL-LUCENT USA, INC., ET AL. | § | |

# ORDER

Before the Court is Defendants Hewlett-Packard Company's and Hewlett Packard Enterprise Company's ("Defendants" or "HP") Motion to Strike Certain Litigation Settlement Agreements. Doc. No. 681. The Court held a hearing on this Motion on June 19, 2017. The Motion is **DENIED**.

# BACKGROUND

Plaintiff Network-1 Technologies, Inc. ("Network-1") accuses Defendants[1] of infringing U.S. Patent No. 6,218,930 ("the '930 Patent"). The '930 Patent was issued on April 17, 2001, and relates to an apparatus and method for remotely powering access equipment over a 10/100 switched Ethernet network. *See* '930 Patent.

---

[1] The remaining Defendants in this action are Hewlett-Packard Company, Hewlett Packard Enterprise Company, and Juniper Networks. However, Network-1 initially asserted this patent against Alcatel-Lucent USA Inc.; Alcatel-Lucent Holdings Inc.; Allied Telesis Holdings K.K.; Allied Telesis, Inc.; AXIS Communications AB; AXIS Communications, Inc.; Dell Inc.; GarrettCom, Inc; Hewlett-Packard Company; Hewlett-Packard Development Company, L.P.; Huawei Technologies Co., Ltd.; Huawei Technologies USA Inc.; Juniper Networks, Inc.; Motorola Solutions, Inc.; NEC Corporation; NEC Corporation of America; Polycom, Inc.; Samsung Electronics Co., Ltd.; Samsung Electronics America, Inc.; Samsung Telecommunications America, LLC; ShoreTel. Inc.; Sony Corporation; Sony Corporation of America; Sony Electronics Inc.; and Transition Networks, Inc. *See* Doc. No. 1.

1

The '930 Patent was previously litigated in *Network-1 Security Solutions, Inc. v. Cisco Systems, Inc.* in 2010 before Judge Leonard Davis. No. 6:08-CV-30 ("the *Cisco* Trial"). During the trial, all of the Cisco Defendants entered into settlement agreements with Network-1.[2]

## APPLICABLE LAW

*Daubert Motion*

Under Federal Rule of Evidence 702, a witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The trial judge has a gate-keeping role to ensure that expert testimony is relevant and reliable. *Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579 (1993). Indeed, "[t]he proponent [of the expert testimony] need not prove to the judge that the expert's testimony is correct, but she must prove by a preponderance of the evidence that the testimony is reliable." *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 276 (5th. Cir. 1998). "The reliability prong [of *Daubert*] mandates that expert opinion 'be grounded in the methods and procedures of science and . . . be more than unsupported speculation or subjective belief.'" *Johnson v. Arkema*, *Inc.*, 685 F.3d 452, 459 (5th Cir. 2012) (quoting *Curtis v. M & S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999)).

Factors to consider in determining whether a proposed expert's methodology is scientifically valid or reliable are:

    (1) whether the expert's theory can be or has been tested;
    (2) whether the theory has been subject to peer review and publication;

---

[2] The Defendants in this case were Cisco Systems, Inc.; Cisco-Linksys, LLC; Adtran, Inc.; Entersays Networks, Inc.; Foundry Netowrks, Inc.; Netgear, Inc; and 3Com Corporation. Netgear, Inc. settled prior to trial.

(3) the known or potential rate of error of the technique or theory when applied;
(4) the existence and maintenance of standards and controls; and
(5) the degree to which the technique or theory has been generally accepted in the scientific community.

*See Daubert,* 509 U.S. at 593–95. A court must decide whether the *Daubert* factors are appropriate, use them as a starting point, and then ascertain if other factors should be considered. *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007).

In *Kumho Tire Company, Limited v. Carmichael*, the Supreme Court applied the *Daubert* principles to technical or specialized expert testimony. 526 U.S. 137 (1999). The Court explained that the overarching goal of *Daubert*'s gate-keeping requirement is to "ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152. A trial court has the discretion to exclude expert testimony if there is "simply too great an analytical gap" between the expert's reasoning and the conclusion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "At base, 'the question of whether the expert is credible or the opinion is correct is generally a question for the fact finder, not the court.'" *Eidos Display, LLC v. Chi Mei Innolux Corp.*, No. 6:11-CV-201-JRG, 2017 WL 1079441, at *2 (E.D. Tex. Mar. 22, 2017) (quoting *Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015)). "Under Rule 702, the question is whether the expert relied on facts sufficiently related to the disputed issue." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 856 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011). "To properly carry this burden, the patentee must 'sufficiently [tie the expert testimony on damages] to the facts of the case.'" *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315–16 (Fed. Cir. 2011) (citation omitted). "Questions about what facts are most relevant or reliable to calculating a reasonable

royalty are for the jury." *i4i Ltd. P'ship*, 598 F.3d at 856. "The jury [is] entitled to hear the expert testimony and decide for itself what to accept or reject." *Id.* Ultimately, "*Daubert* and Rule 702 are safeguards against unreliable or irrelevant opinions, not guarantees of correctness. "Federal Rules of Evidence 403 provides that otherwise relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusing the issues, or misleading the jury. Fed. R. Evid. 403.

*Settlement License Agreements*

The Federal Circuit recognizes the relevance of settlement agreements to the issue of reasonable royalties in patent cases. *In re MSTG, Inc.,* F.3d 1337, 1348 (Fed. Cir. 2012). "There is no *per se* rule barring reference to settlements simply because they arise from litigation." *AstraZeneca AB v. Apotex Corp.,* 782 F.3d 1324, 1336 (Fed. Cir. 2015). However, litigation licenses are not *per se* admissible. *See Res-Q-Net.com, Inc. v. Lansa, Inc.,* 594 F.3d 860, 872 (Fed. Cir. 2010). Because litigation licenses are influenced to some degree by the coercive environment of patent litigation, "the Court assesses litigation licenses on a case-by case basis in determining their admissibility." *ReedHycalog, UK, Ltd. V. Diamond Innovations Inc.,* 727 F. Supp. 2d 543, 547 (E.D. Tex. 2010).

Specifically, when evaluating the admissibility of a settlement license agreement, the court must determine the reliability of the settlement license agreement in the context of the hypothetical negotiation and the economic demand for the patented technology, while under the assumption that the asserted patent claims are valid and infringed. *LaserDynamics, Inc. v. Quanta Computer, Inc.,* 694 F.3d 51, 77-78 (Fed. Cir. 2012); *Uniloc USA, Inc., v. Microsoft Corp.,* 632 F.3d 1292, 1312 (Fed. Cir. 2011); *Lucent Techs., Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1325 (Fed. Cir. 2009).

**DISCUSSION**

Defendants move to strike certain litigation settlement agreements between Network-1 and various defendants. Doc. No. 681 at 1. Defendants categorize the litigation settlement agreements as either "Cisco Trial Settlement Agreements," the settlement agreements entered during the *Cisco* trial, or "Pending Case Settlement Agreements,"[3] the subsequent license agreements entered after the Cisco Trial Settlement Agreements with the Defendants sued in this action. *Id.*

Defendants argue that the Cisco Trial Settlement Agreements and the Pending Case Settlement Agreements were only entered into because of highly adverse circumstances. Doc. No. 681 at 1. Defendants also argue that both sets of settlement agreements: (1) do not reflect the conditions of a hypothetical negotiation or the value of the '930 Patent; and (2) are prejudicial, and should thus be inadmissible. Doc. No. 681 at 1.

## I. Cisco Trial Settlement Agreements

Defendants seek to exclude the Cisco Trial Settlement Agreements for three reasons. First, they were entered into under highly adverse trial circumstances. Second, they were entered into under a desire to avoid further litigation. And finally, they resulted in a per-port royalty rate.

### a. Trial Circumstances

The Cisco Trial Settlement Agreements encompass the license agreements entered into during the *Cisco* Trial. Doc. No. 681 at 1. These are licenses for the '930 Patent, which is asserted in the instant case. Defendants contend that the Cisco Settlement Agreements are not probative of the economic value of the '930 Patent but rather Cisco's desire to avoid a jury verdict because of the disadvantageous trial circumstances. Doc. No. 681 at 2.

---

[3] Defendants note that they do not include the Netgear, Inc. settlement agreement in the definition of the "Pending Case Settlement Agreements" in this motion even though Netgear, Inc. was a defendant in both suits because Netgear's settlement agreement was entered prior to *Cisco* trial. *See* Doc. No. 681 at 3, n. 3.

5

Defendants focus their inadmissibility argument on the adverse circumstances Cisco faced during trial. Doc. No. 681 at 3. Defendants note that Judge Davis granted Network-1's *Daubert* motion that precluded Cisco's non-infringement analysis of two disputed claims two weeks before trial, which severely undercut Cisco's non-infringement defense. *Id.* Then, during trial, Cisco's expert witness, Karl Nakamura, unexpectedly testified on cross-examination that the '930 Patent was not obvious and thus "certainly valid," which undermined Cisco's invalidity defense. Doc. No. 681 at 4. Defendants contend that because Cisco was left without a viable non-infringement or invalidity defense, it was forced to settle under a "tainted environment," especially given Judge Davis's repeated encouragement that the parties settle. Doc. No. 681 at 4-5.

Relying on *LaserDynamics, Inc. v. Quanta Computer USA, Inc.,* Defendants argue the Cisco Trial Settlement Agreements were entered into under "unique coercive circumstances" similar to the BenQ settlement agreement. 694 F.3d 51 (Fed. Cir. 2012); Doc. No. 681 at 7.

Network-1 responds that the Cisco trial circumstances actually bring the negotiation of the Cisco Trial Settlement Agreements closer to the hypothetical negotiation. Doc. No. 719 at 5. Plaintiff contends that because the non-infringement opinions were stricken prior to trial, and the expert witness testified that the patent was valid, the parties were closer to the position of assuming the patent was valid and infringed when Cisco took the license. *Id*.

First, the Federal Circuit has held that a finding of validity and infringement placed settlement negotiations closer to the setting of a hypothetical negotiation and ultimately admitted the contested litigation settlement license. *AstraZeneca AB v. Apotex Corp.,* 782 F.3d 1324, 1336 (Fed. Cir. 2015). Here, Cisco's weakened invalidity and non-infringement arguments at the time of the negotiation of the Cisco Trial Settlement Agreements similarly brings the negotiation closer to the hypothetical negotiation.

Second, Defendants' reliance on *Laserdynamics* is misplaced. In *LaserDynamics,* the license at issue was between Laserdynamics and BenQ. *LaserDynamic, Inc. v. Quanta Computer, Inc.,* 694 F.3d at 58. BenQ licensed the patent weeks before trial after it was repeatedly sanctioned by the district court for discovery misconduct and misrepresentations. *Id*. The district court cut BenQ's time for *voir dire,* opening statement, and closing argument. *Id*. The district court also struck one of BenQ's pleaded defenses, awarded attorneys' fees to LaserDynamics for bringing the sanctions motion, and sanctioned BenQ $500,000 as an additional punitive and deterrent measure. *Id.* The district court felt these sanctions were appropriate because BenQ "demonstrated a conscious intent to evade the discovery orders of this Court, as well as violated this Court's orders and the rules to an extent previously unknown by this Court." *Id*. Thus, these sanctions for litigation misconduct put BenQ at a severe procedural disadvantage at the time of trial. The Federal Circuit held the district court erred in admitting the BenQ settlement license because the unique circumstances surrounding the BenQ settlement—which was entered into after BenQ had been repeatedly sanctioned by the district court—made the license unreliable. *Id*. at 77-78.

In *Cisco*, Cisco's invalidity defenses and non-infringement arguments were undermined by *Daubert* rulings and unexpected expert testimony. However, *Daubert* rulings and expert testimony allow for adjudication of the merits of the case. The Defendants in *Cisco* were not procedurally handicapped by litigation sanctions wholly unrelated to the merits of the case. The rulings and testimony in the *Cisco* case went straight to the merits of infringement and validity. Thus, although the Cisco Trial Settlement Agreements were entered into while Cisco was in a weakened litigation position, the position was one that resulted from adjudication of issues relevant to valuing a license. The circumstances of the *Cisco* Trial are not parallel to the circumstances surrounding the *LaserDynamics* settlement agreement. Doc. No. 681 at 7.

Although the Federal Circuit ultimately found the BenQ settlement agreement inadmissible, it recognized:

> Actual licenses to the patented technology are highly probative as to what constitutes a reasonable royalty for those patent rights because such actual licenses most clearly reflect the economic value of the patented technology in the marketplace.

*LaserDynamics,* 694 F.3d at 77-79. In fact, the first of the *Georgia-Pacific* factors to determine the amount of a reasonable royalty for a patent license is "[t]he royalties received by the patentee for the *licensing of the patent in suit*, proving or tending to prove an established royalty." *Georgia-Pacific Corp. v. U.S. Plywood Corp.,* 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970) (emphasis added).

The Cisco Trial Settlement Agreements are actual licenses of the '930 Patent and are thus highly probative of the '930 Patent's market value. Further, the Defendants' concern with the impact the adverse circumstances of litigation are best addressed through cross-examination. *See Tycho Healthcare Group LP v. E-Z-EM, Inc.,* 2010 WL 774878 at *2 (E.D. Tex. Mar. 2, 2010) ("parties are entitled to show whether and to what extent the rate from a prior license agreement is the result of a compromise or reflects a desire to avoid litigation").

### b. *Desire to Avoid Litigation*

Defendants next argue that the Cisco Trial Settlement Agreements should be excluded because they were entered into under a desire to avoid further litigation, again relying heavily on *LaserDynamics.* Doc. No. 681.

With *ResQNet.com, Inc. v. Lansa, Inc.,* the Federal Circuit admitted expert testimony that relied on the "most reliable license in this record [which] arose out of litigation."594 F.3d 860, 872 (Fed.Cir. 2010). *LaserDynamics* did not overturn this holding in *ResQNet.com.* Instead, the Federal Circuit distinguished the BenQ settlement agreement as "the least reliable license" on the record "by a wide margin" because it reflected a strong desire to avoid further litigation rather than

the value of the patent-in-suit. F.3d at 77-78 (Fed. Cir. 2012). The Federal Circuit noted that because the BenQ settlement agreement was six times larger than the next highest license for the patent-in-suit and entered into under highly adverse circumstances going into trial, the license did not reflect the economic value of the patent-in-suit. *Id.*

By contrast, the Cisco Trial Settlement Agreements are licenses for the patent-in-suit, and are in line with the license agreements that follow, as both parties have acknowledged.[4] Doc. No. 931 at 66:5-14, 71:10-14. In fact, the license agreements that follow the Cisco Trial Settlement Agreements have increased per-port royalty rates. Doc. No. 929 at 3; Doc. No. 930 at 7.

### c. *Per-Port Royalty Rate*

Defendants also argue that the Cisco Trial Settlement Agreements reflect Cisco's weakened position during trial because it is the first license agreement that obligates a per-port royalty rate, which is not reflective of the true value of the '930 Patent. Doc. No. 681 at 2; Doc. No. 929 at 1.

Defendants contend that "ports are not part of the invention of the '930 Patent and HPE asserts that using ports as a basis for a royalty calculation is improper and contradicts current case law on recoverable damages in patent infringement cases." Doc. No. 681 at 5. However, HP's assertion is unsupported by an expert report or a case cite.[5] Doc. No. 681 at 5. HP also contends that a per-port royalty rate does not accurately reflect the value of the '930 Patent because only "20-30% of PoE ports on a PSE product are typically used by an end-user." Doc. No. 738 at 4. To support this contention, HP relies on the deposition of Mark Thompson, an HP executive who is

---

[4] HP acknowledges that the per-port royalty rate in the Cisco Trial Settlement Agreement is in line with the Pending Case Settlement Agreements but notes it is because the Cisco Trial Settlement Agreement are tainted by a MFRR provision. Doc. No. 930 at 3, 7.
[5] In its Reply, Defendants point to the deposition of Joseph Deptula, an inventor of the '930 Patent, but the deposition merely shows that Deptula admitted that the inventors of the '930 Patent did not invent the RJ45 connector. Doc. No. 738-4 at 62:2-4.

9

the director of product line management for campus switching. However, Thompson admitted that the estimate is a "general guess." Doc. No. 738-5 at 81:6-12. Defendants also assert that the per-port royalty structure was implemented only once Network-1 had significant leverage over Cisco during the jury trial. Doc. No. 738 at 4.

Network-1 counters with explanations by its experts, Knox and Mills, as to why a per-port royalty rate is appropriate. Doc. No. 719 at 9. Network-1's CEO, Corey Horowitz, explains that he learned from prior licensing negotiations that applying a percentage of net sales to a price of a product for royalty calculations may lead to inaccurate representations of the value of a patented invention. Doc. No. 719 at 9.

Defendants' arguments with respect to the per port royalty go to the weight of the evidence, rather than the admissibility. okay

## II. Pending Case Settlement Agreements

The Pending Case Settlement Agreements encompass the subsequent license agreements entered after the Cisco Trial involving Network-1 and Defendants in this cause of action.[6] Defendants argue that because the Cisco Trial Settlement Agreement had a clause stipulating that Network-1 cannot enter into any license with a third party on better terms ("a most favored nations clause"), the Pending Case Settlement Agreements should also be excluded. Doc. No. 681 at 5. Defendants contend that because the Pending Case Settlement Agreements require "an express acknowledgement that the agreement is entered into to settle the pending litigation" and specifies "an on-going per-port royalty requirement directly tied to the Network-1's tainted agreement with Cisco," they should be inadmissible. Doc. No. 681 at 7.

---

[6] Specifically, Defendants are moving to strike the licensing agreements with Alcatel; Allied Telesis; Dell; GarrettCom; Huawei; Motorola; Polycom; Samsung; ShoreTel; Sony; and Transition.

Network-1 notes that HP does not present evidence indicating that the Pending Case Settlement Agreements were entered into because of the Cisco Trial Settlement Agreements or because of the *Cisco* Trial. Doc. No. 719 at 13. While the Cisco Trial Settlement Agreements included a most favored nations clause, the Pending Case Settlement Agreements were entered into willingly by the parties to those licenses and thus are probative of the market value of the '930 Patent. Doc. No. 930; Doc. No. 931 at 71:10-72:5. The Pending Case Settlement Agreements are probative of the economic value of the patented technology in the marketplace because they license the '930 Patent to the majority of the PoE industry at consistent rates. Further, the companies who accepted the Pending Case Settlement Agreements are companies who directly compete with Defendants' accused products. Doc. No. 719 at 4. Thus, there is substantial probative value in the Pending Case Settlement Agreements.

### III. **Hypothetical Negotiation**

Defendants argue that because Cisco was left without a viable non-infringement or invalidity defense during its jury trial, Cisco was forced to settle under a "tainted environment." Doc. No. 738 at 3. However, as discussed above, the Federal Circuit found that licenses negotiated to settle a case after the district court held the patents to be valid and infringed were relevant because they reflect the "willing licensor-willing licensee" fictional negotiation. *AstraZeneca AB v. Apotex Corp.,* 782 F.3d 1324, 1336 (Fed. Cir. 2015) (quoting John M. Skenyon et al, *Patent Damages Law and Practice* § 1:15, at 25 (2013 ed.)). Thus, instead of a weakened litigation position as claimed by Defendants, Cisco was forced into circumstances more similar to a hypothetical negotiation. *See AstraZeneca AB v. Apotex,* 782 F.3d at 1336 (Fed. Cir. 2015).

Defendants contend that the date of hypothetical negotiations between Network-1 and HP further renders the Cisco Trial Settlement Agreements and Pending Case Settlement Agreements

irrelevant. Doc. No. 681 at 8. HP notes that the earliest hypothetical negotiation date was November 2003 because that was when the first accused HP product was sold. Doc. 681 at 8. The Cisco Trial Settlement Agreements were entered in July 2010 and the Pending Case Settlement Agreements were entered into, at the earliest, in October 2012. Doc. No. 681 at 8. Defendants argue that these agreements and the context in which they were entered into are not probative of the economic value of the '930 Patent. Doc. No. 681 at 8.

Defendants' contention that settlement agreements must be entered into at the earliest hypothetical negotiation date would prevent litigation licenses from ever being admissible, which contradicts Federal Circuit holding that "there is no per se rule barring reference to settlements because they arise from litigation." *AstraZeneca AB v. Apotex Corp.,* 782 F.3d 1324, 1336 (Fed. Cir. 2015). Further, courts around the country have admitted litigation licenses because they are relevant to the determination of a reasonable royalty.[7] *See, e.g., W.L. Gore & Associates, Inc. v. C.R. Bard, Inc.,* 2017 WL 525668 at *1 (D. Del. Fed, 8, 2017) (admitting a litigation license agreement because prejudicial concerns may adequately addressed through cross-examination); *Sanofi-Aventis U.S. v. Genetech, Inc.,* 2016 WL 7444676 at *2 (C.D. Cal. Mar. 30, 2016) (admitting five settlement agreements because they were relevant to the determination of a reasonable royalty).

---

[7] *See also Elbit Syst. Land and C41 Ltd. v. Hughes Network Sys., LLC,* Case No. 2:15-CV-37, Doc. No. 388 (E.D. Tex. June 20, 2017) (admitting expert testimony that relied on litigation licenses that were not for the patent-in-suit because they were "sufficiently comparable to the hypothetical license at issue in suit"); *Blitzsafe Texas, LLC v. Honda Motor Co., Ltd.,* Case No. 2:15-CV-1274, Doc. No. 385 (E.D. Tex. Jan. 11, 2017) (admitting expert testimony that relied on lump sum licenses for the patent-in-suit even though the remaining licenses required a running royalty structure); *PerdiemCo, LLC v. InusTrack LLC,* Case No. 2:15-CV-727, Doc. No. 302 (E.D. Tex. Nov. 9, 2016) (admitting expert testimony based on comparable licenses, even though there were four licenses of record to the patented technology); *ZiiLabs Inc., Ltd. v. Samsung Electronics Co., Ltd.,* Case No. 2:14-CV-203, Doc. No. 506 (E.D. Tex. Dec. 4, 2015) (admitting expert testimony that relied on a litigation settlement license); *SimpleAir, Inc. v. Microsoft Corp.,* Case No. 2:11-CV-416, Doc. No. 765 (E.D. Tex. Dec. 10, 2014) (denying judgment as a matter of law that the jury award was unreasonable because at trial, the parties extensively disputed the comparability of third-party settlement licenses).

## IV. Prejudicial Issues

Defendants finally argue that admitting the Settlement Agreements would result in a "trial within a trial." Doc. No. 738 at 3. Defendants rely on *Fenner Invs., Ltd. v. Hewlett-Packard Co.,* to argue that "admitting settlement agreements inevitably invited a 'mini-trial' on similarities and differences in the facts between this case and the settled claims." 2010 WL 1727916, *4 (E.D. Tex. Apr. 28, 2010). However, in *Fenner,* the expert was relying on a "purportedly comparable license" rather than a license to the patent-in-suit. This argument is unpersuasive.

## CONCLUSION

Defendants' Motion to Strike Certain Litigation Settlement Agreements is **DENIED**.

So ORDERED and SIGNED this 23rd day of October, 2017.

_____
K. NICOLE MITCHELL
UNITED STATES MAGISTRATE JUDGE

13